# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| **VERKITA WASHINGTON,** | ) |
| | ) |
| **Plaintiff,** | ) Case No. |
| | ) |
| v. | ) Judge |
| | ) Magistrate Judge |
| **TRUSTPOINT HOSPITAL, LLC,** | ) |
| | ) Jury Demand |
| **Defendant.** | ) |

## COMPLAINT

For her Complaint against Defendant TrustPoint Hospital, LLC ("Defendant"), Plaintiff Verkita Washington ("Ms. Washington") states:

## PARTIES

1. Ms. Washington is a former employee of Defendant.

2. Defendant is a Tennessee limited liability company with its principal place of business at 6100 Tower Circle, Suite 1000, Franklin, Tennessee 37067-1509. Defendant may be served with process through its registered agent, CT Corporation System, 300 Montvue Road, Knoxville, Tennessee 37919-5564.

## JURISDICTION AND VENUE

3. This is an action for damages and equitable relief for unlawful employment practices brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII"), and 42 U.S.C. § 1981 ("Section 1981"). The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(4). Venue is proper under 28 U.S.C. § 1391.

4. Ms. Washington has met all conditions precedent to the filing of this Complaint. She timely filed a Charge of Discrimination with the U.S. Equal Employment Opportunity

Commission ("EEOC") on November 20, 2020. The EEOC mailed her a Notice of Right to Sue on April 14, 2022.

## FACTS

5. Ms. Washington is an African American female and a Licensed Master Social Worker ("L.M.S.W.") who worked for Defendant at its facility in Murfreesboro, Tennessee, as a Social Worker II from August 27, 2018, until it discharged her on July 17, 2020.

6. Ms. Washington was qualified for her job with Defendant and performed it in a competent and satisfactory manner.

7. During her employment, Defendant subjected Ms. Washington to disparate treatment and discriminated against her in the terms, conditions, and privileges of employment because of her race.

8. Some of Ms. Washington's Caucasian co-workers in the Social Work Department, including but not limited to Nichole Hollinsworth and Ashley Wenzel, received more pay than she did for the same or equivalent work, even though Ms. Washington had worked for Defendant longer than they had, was licensed by the State of Tennessee (Ms. Hollinsworth was not), and was a Master's degree-level social worker with more experience in Tennessee than either.

9. In late 2019 and 2020, Ms. Washington expressed her interest in opportunities for advancement and being promoted to a social work supervisor position to Defendant. She also requested that she be trained for a court liaison position.

10. Defendant did not consider, meet with, or interview Ms. Washington for promotion while it did consider, meet with, and interview less qualified Caucasian co-workers,

including but not limited to Ms. Hollinsworth and Ms. Wenzel. It further trained Ms. Hollinsworth and Ms. Wenzel for court liaison positions and gave them those positions.

11. During her employment with Defendant, Ms. Washington spoke out about and reported concerns of race discrimination, retaliation, instances of patients having sexual intercourse and complaining about sexual harassment and assault at Defendant's facility, and other illegal activity to Defendant's managers and Human Resources representatives.

12. Ms. Washington further reported activities that occurred at Defendant's facility that she reasonably believed to be illegal to the United States Department of Health and Human Services, Office of Inspector General ("OIG"), in late 2019 and in 2020.

13. Following her reports, Defendant overloaded Ms. Washington with work, forbid her from working overtime, subjected her to increased scrutiny and harassment, gave her a retaliatory Performance Improvement Plan, and discharged her.

14. Following her reports, Ms. Washington's supervisor, Kayla Norris, told Director Robin Morgan, Elizabeth Edwards, and other employees that she was going to force Ms. Washington to quit or fire her.

15. Following Ms. Washington's reports, Ms. Norris went so far as to ask former HR Director Karah Pennington and HR Representative Christy Muscharella, "How can we make Verkita [Washington] quit?" and suggested that she (Norris) should "cut her [work] hours."

16. Further, Ms. Washington had an agreement with a Caucasian supervisor, Kelley Bivens, to provide her Licensed Clinical Social Worker ("L.C.S.W.") supervision for $40 per session. Ms. Bivens advised Ms. Washington that she could only provide L.C.S.W. supervision to three social workers, including Ms. Norris. After Ms. Norris stated that she was going to try

3

to make Ms. Washington quit or fire her, Ms. Bivens advised Ms. Washington that she could no longer provide her the L.C.S.W. supervision.

17. Ms. Washington's L.C.S.W. supervision hours were not related to Defendant, yet it interfered with and terminated them because of her race and/or in retaliation for her complaints of discrimination.

18. On July 17, 2020, Defendant terminated Ms. Washington's employment without notice, warning, or any opportunity to cure any alleged conduct issues.

19. On July 17, 2020, Defendant's Director of Human Resources, Carrie Lovett, asked Ms. Washington if she had recorded any co-workers engaging in conversation that day. Ms. Washington advised Ms. Lovett that she had.

20. Ms. Lovett stated to Ms. Washington that she "ha[d] the right to record" conversations "under Tennessee state law," but that Ms. Washington had allegedly "shared" a recording containing Protected Health Information ("PHI") with a co-worker, Elizabeth Edwards, in the social work office, and that Ms. Washington had allegedly had contact with a patient after the patient had been discharged from Defendant's facility.

21. Ms. Lovett stated that "both occurrences" referenced in the preceding paragraph were "violations of [Defendant's] zero tolerance policies" and that Ms. Washington was being terminated effective immediately for "both" of those reasons.

22. Defendant's alleged reasons for discharging Ms. Washington were pretexts for race discrimination and/or retaliation.

23. Ms. Washington recorded certain conversations of co-workers because she believed that Defendant was engaging in illegal activity and discriminating and retaliating against her.

24. On or about July 17, 2020, one Ms. Washington's co-workers, Michelle Ellis (L.B.S.W.), reported to Ms. Norris and/or Ms. Lovett that Ms. Washington had recorded Ms. Ellis and/or co-workers engaging in conversation.

25. As of July 17, 2020, Ms. Washington had not shared any PHI with anyone outside of Defendant's facility.

26. Ms. Washington had played a small portion of a recording for a co-worker, Ms. Edwards, who worked in the same social work office as Ms. Washington.

27. When Ms. Washington played the portion of the recording, she and Ms. Edwards were in an empty group therapy room within the Behavioral Health Unit in Defendant's facility. No one else was present.

28. Ms. Washington fast forwarded through and skipped over much of the recording to get to inappropriate comments that Ms. Ellis had made about her and Ms. Edwards.

29. Ms. Edwards did not hear any PHI on the partial recording that Ms. Washington played for her.

30. When she discharged Ms. Washington on July 17, 2020, Ms. Lovett admitted to Ms. Washington that Defendant "did not know" whether Ms. Edwards or any other co-worker had heard any PHI on any recording that Ms. Washington made.

31. Ms. Edwards later advised an Investigator for the Board of Social Worker Licensure, Melissa Judd, that she had not heard any PHI on the recording that Ms. Washington played for her.

32. Ms. Lovett's statement that Ms. Washington had "shared PHI" on a recording "with a co-worker" and "violated [its] zero tolerance policies" by doing so was false.

33. Further, during her employment with Defendant, Ms. Washington's non-African American co-workers in the social work office and other non-African American agents and employees of Defendant, including physicians, nurses, social workers, and other staff, regularly shared PHI between and among themselves, including in emails and text messages on their personal electronic devices.

34. Defendant did not discharge any of Ms. Washington's non-African American co-workers for sharing PHI between and among themselves.

35. Recognizing its grossly disparate treatment with respect to "both" of the alleged reasons for which it specifically told Ms. Washington that it was discharging her on July 17, 2020, Defendant shifted, expanded, and contracted its alleged justifications for discharging her.

36. On July 17, 2020, Defendant stated to Ms. Washington that, while she "had the right to record" conversations "under Tennessee state law," it was discharging her for "sharing" PHI with Ms. Edwards and for having post-discharge contact with a patient.

37. On January 29, 2021, Defendant represented to the EEOC that it discharged Ms. Washington for "forward[ing] multiple emails containing" PHI "from her work email to her personal email" on June 18, 2020, and for "recording conversations that contained PHI" "less than a month later."

38. At the time that it discharged her, Defendant did not know that Ms. Washington had forwarded any emails from her work to her personal email on June 18, 2020. It discovered this after it discharged her.

39. Further, while Defendant originally stated that Ms. Washington's allegedly "sharing" PHI with Ms. Edwards was "a HIPAA violation," merely "recording" PHI is not such

6

Case 3:22-cv-00516   Document 1   Filed 07/11/22   Page 6 of 11 PageID #: 6

a violation and, therefore, was not grounds for her discharge. No HIPAA violation occurs until a provider "shares" PHI with an unauthorized third party.

40. As to the second originally stated reason for Ms. Washington's discharge, which Defendant retracted or dropped before the EEOC, Ms. Edwards, who is Caucasian, allegedly violated Defendant's alleged "zero tolerance policies" by having repeated, post-discharge contact and communications with a patient. She did so without the patient's conservator's consent.

41. Defendant did not discharge Ms. Edwards when she had post-discharge contact and communications with a patient.

42. Instead, Defendant placed Ms. Edwards on a brief administrative leave, with pay.

43. Defendant then conducted a short investigation into Ms. Edwards' conduct in which it verified that she had had post-discharge telephone and email communications with the patient and had told the patient that she "loved" him.

44. Upon information and belief, the patient's conservator complained to Defendant about Ms. Edwards' post-discharge contact with the patient.

45. No one made complaints to Defendant about Ms. Washington having any post-discharge contact with a patient.

46. Following its short investigation into her conduct, Defendant promptly reinstated Ms. Edwards to work.

47. Ms. Washington brought this specific example of the disparate treatment of her as compared to Ms. Edwards to HR Director Lovett's attention on July 17, 2020, referencing her "counterpart, white female," and stating that Defendant was "discriminating against [her]." Ms. Lovett proceeded to discharge Ms. Washington anyway before conducting or directing any investigation into her complaint of race discrimination.

48. Defendant did not conduct any investigation into Ms. Washington's complaints that it discriminated and retaliated against her.

49. Instead, after it discharged her, Defendant conducted a forensic or similar examination of Ms. Washington's work email account in a discriminatory and retaliatory effort to unearth evidence that it could use against her. This is when it discovered that Ms. Washington had forwarded certain emails to her personal email account on June 18, 2020, a month before it discharged her.

50. Defendant did not conduct a forensic or similar examination of the email accounts of non-African American agents and employees who had shared PHI with each other and/or who allegedly had post-discharge contact with a patient contemporaneous with the time that it conducted the examination of Ms. Washington's email account.

51. Because of the discrimination and retaliation she was experiencing, supervisor Norris' stated desire to make her quit or fire her, and to prevent a loss or destruction of evidence related to patient safety concerns, potential insurance fraud, discrimination, retaliation, and illegal activity that she had reported to Defendant and to the OIG, Ms. Washington did send some emails from her work email to her personal email on June 18, 2020.

52. Ms. Washington has not shared any of these emails with anyone other than attorneys in connection with her legal claims against Defendant and for the purpose of seeking legal advice.

53. On September 24, 2020, Ms. Washington's attorney sent a letter to HR Director Lovett by email asserting Ms. Washington's race discrimination and retaliation claims against Defendant.

54. Eight days later, on October 2, 2020—over 75 days after it had terminated Ms. Washington's employment—Defendant reported Ms. Washington's alleged violations of its alleged zero tolerance policies to the Tennessee Department of Health, Board of Social Worker Licensure ("Board").

55. Defendant did not report its non-African American agents' and employees' conduct of comparable seriousness to the Board, including but not limited to their sharing of PHI between and among themselves and their post-discharge contact with patients.

56. Defendant made its untimely October 2, 2020, report against Ms. Washington to the Board in retaliation for her having asserted race discrimination and retaliation claims against it.

57. Defendant's actions on and after October 2, 2020, were malicious and designed to further retaliate against and cause harm to Ms. Washington and to hinder her ability to continue practicing social work.

58. Despite Defendant's efforts, the Board did not revoke, suspend, or place Ms. Washington's license on probation, nor did it fine or discipline her, any or all of which it could have done in response to Defendant's false allegations and would have done had those allegations been substantiated.

59. Nevertheless, in addition to its discriminatory and/or retaliatory discharge on July 17, 2020, Defendant's discriminatory and retaliatory representations to the Board on and after October 2, 2020, harmed and caused further damage to Ms. Washington.

60. As described above, Defendant discriminated against Ms. Washington in the terms, conditions and privileges of employment, subjected her to disparate treatment, and discharged her because of her race, in violation of Title VII and Section 1981.

61. As described above, Defendant retaliated against Ms. Washington during and after her employment with it because of her opposition to and complaints about race discrimination and retaliation, in violation of Title VII and Section 1981.

62. Defendant's conduct as described in this Complaint was malicious and/or recklessly indifferent to Ms. Washington's federally protected rights, entitling her to punitive damages under Title VII and Section 1981.

63. As a direct result of Defendant's discriminatory and retaliatory conduct, Ms. Washington has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life; and has incurred attorneys' fees, costs and litigation expenses.

**RELIEF REQUESTED**

WHEREFORE, Ms. Washington respectfully requests:

1. A jury trial;

2. Back pay and damages for lost benefits;

3. Compensatory damages for embarrassment, humiliation, emotional distress and anxiety, inconvenience, and loss of enjoyment of life;

4. Front pay and damages for lost benefits;

5. Punitive damages;

6. Attorneys' fees, costs and litigation expenses;

7. Prejudgment interest and, if applicable, post judgment interest; and

8. Such other and further legal or equitable relief to which she may be entitled.

Respectfully submitted,

s/Douglas B. Janney III
Douglas B. Janney III (TN BPR No. 19112)
Law Office of Douglas B. Janney III
2021 Richard Jones Road, Suite 310A
Nashville, Tennessee 37215
(615) 742-5900
doug@janneylaw.com

Attorney for Plaintiff

11
Case 3:22-cv-00516   Document 1   Filed 07/11/22   Page 11 of 11 PageID #: 11